IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| OLIVIA GARCIA,<br><br>                    Plaintiff,<br><br>          vs.<br><br>MICHAEL J. ASTRUE, Commissioner of<br>Social Security,<br><br>                    Defendant. | **MEMORANDUM DECISION & ORDER**<br><br>Case No: 2:09-CV-1114 DN<br><br>Magistrate Judge David Nuffer |

Plaintiff Olivia Garcia filed suit seeking judicial review of the decision of the

Commissioner denying her application for Disability Insurance Benefits under Title II of the

Social Security Act.[1]  Plaintiff alleges that she is unable to work due to rheumatoid arthritis.[2]

The case is before the magistrate judge by consent of the parties under 28 U.S.C. § 636(c).[3]

After a careful review of the entire record and the parties' submissions, the court concludes that

the decision of the Commissioner should be affirmed.

---

[1] 42 U.S.C. §§ 401-434.

[2] Tr. 24.

[3] Docket no. 11, filed April 14, 2010.

## PROCEDURAL HISTORY

Garcia applied for benefits on March 15, 2007,[4] alleging that she became unable to work on September 15, 2005.[5] Garcia's application was denied initially,[6] and on reconsideration.[7] She then obtained a hearing before an Administrative Law Judge (ALJ) which was held September 3, 2008.[8] In a written decision, the ALJ determined that Garcia was not eligible for benefits because she was capable of performing her past relevant work and other jobs that exist in the national economy.[9] The Appeals Council denied Garcia's request for review, making the ALJ's decision the final decision of the Commissioner.[10]

---

[4]Tr. 110-17.

[5]Tr. 110.

[6]Tr. 58, 63-65.

[7]Tr. 60, 67-69.

[8]A transcript of the hearing may be found in the administrative record at pages 21-57.

[9]Tr. 18, 19.

[10]Tr. 1-3.

# SUMMARY OF EVIDENCE

## A. Evidence at the Administrative Hearing

### 1. Garcia's Testimony

At the time of the hearing, Garcia was 38 years old.[11]  She had a twelfth-grade education.[12]  She was married and had two children, ages 11 years old and 15 months.[13]  Her husband was working, and the family was covered by health insurance.[14]

Garcia testified that she experiences pain everywhere including her back, knees, ankles, fingers, elbows and neck.  She has pain every day, which will hurt for a while and then subside.  On a scale of 1-10, she rated her pain as a 10.[15]  On some days, she will have less pain, but there is always some pain.  Sometimes, she needs help with household chores such as vacuuming, cleaning,[16] and cooking.[17]  She can do a little yard work such as pulling weeds, but her father-in-law does most of the yard work.[18]  She has good days and bad days.  On a good day, she would be able to do the laundry.  On a bad day, it hurts to even move.[19]  She has more bad days than

---

[11]Tr. 25.

[12]Tr. 25.

[13]Tr. 25-26, 43-44.

[14]Tr. 26.

[15]Tr. 32-33.

[16]Tr. 33.

[17]Tr. 38.

[18]Tr. 41.

[19]Tr. 38.

good days.[20]  She testified that on her bad days, she would not be capable of working,[21] and there are no days when she is completely pain free.[22]  At the time of the hearing, she was taking Tramadol "now and then," but sometimes the pills made her dizzy, gave her a stomach ache, or made her "loony."[23]  In the past, she has taken Prednisone for her arthritis.  It helped, but it made her sick.  When she did not have insurance, she took ibuprofen which would relieve the pain a little bit.[24]

 She has difficulty sitting because her back and hips hurt.[25]  She can sit for 10-15 minutes before she would have to stand up.[26]  She stated that she can sit longer than she can stand because her knees will hurt or buckle or her feet are swollen and in pain.[27]  She has trouble with swelling in her hands, feet, and knee.[28]  She has difficulty walking because her back, knees, and feet hurt.[29]  She might be able to walk a block.[30]  She has to lie down during the day, and usually lies down when her daughter takes a nap.[31]  She can lift a gallon of milk, but it hurts, and

---

[20]Tr. 39.

[21]Tr. 39.

[22]Tr. 39.

[23]Tr. 39-40.

[24]Tr. 40.

[25]Tr. 33.

[26]Tr. 33.

[27]Tr. 34.

[28]Tr. 34.

[29]Tr. 36.

[30]Tr. 37.

[31]Tr. 40.

sometimes she has to hold it with both hands.  She can lift her little daughter; it hurts, but she does not have a choice.  It is hard just to bend over to pick her up.[32]

She has problems using her hands and fingers.  For example, the day of the hearing she could not put a scrunchie in her hair because she could not grab it.  Sometimes she cannot open milk, or open a can because she cannot hold the can opener.  She cannot use a screwdriver to turn screws because the movement hurts her wrists.  She can pick up a paperclip, except for times when her fingers are numb and tingly.[33]  With regard to dressing and grooming, she sometimes has trouble buttoning buttons because her fingers will swell or hurt.  She does it anyway, however, although it takes her awhile[34]  She sometimes has difficulty writing with a pen because her hand will hurt, her fingers will start to stiffen up, and her wrist will start hurting.[35]  She stated that she would not be able to type or use a keyboard because it requires constant movement.  In fact, she sometimes needs help dialing a telephone.[36]  Her symptoms are worse in her right hand which is her dominant hand.[37]  In the mornings, her hands are stiff and swollen.  Sometimes, she will soak them in hot water and rub them, or wrap them in a warm towel.[38]  Sometimes the joints in her hand "lock up," especially the right hand.[39]

---

[32]Tr. 37.

[33]Tr. 35.

[34]Tr. 37-38.

[35]Tr. 35-36.

[36]Tr. 36.

[37]Tr. 41-42.

[38]Tr. 41.

[39]Tr. 42.

Garcia became pregnant after she was diagnosed with rheumatoid arthritis.  She stated that she actually felt better during the pregnancy.[40]

Garcia is able to care for her children although the 11-year-old helps with the 15-month-old when she was not in school.[41]  Garcia also gets help from her mother and mother-in-law.[42]

### 2. Testimony of the Vocational Expert

The Vocational Expert (VE) testified that Garcia had past relevant work as a cashier/food server which was light, semi-skilled work; a restaurant hostess, which was light work; and as a security guard which was light, semi-skilled work.[43]

The ALJ then asked the VE about a hypothetical person who was 38 years old, with a 12th grade education, who suffered from rheumatoid arthritis and mild depression, and had the following physical Residual Functional Capacity (RFC):  She could sit continuously for 2-3 hours up to a total of 6-8 hours in an 8-hour day; stand continuously for 2-3 hours for a total of 4 hours in an 8-hour day; lift 12 to 15 pounds occasionally and 10 pounds frequently;  occasionally could walk, climb stairs, squat, kneel, reach above her shoulders, push/pull, use foot controls, and drive a vehicle;  frequently bend/stoop, turn the arms and wrists, open and close fists, and use her hands and fingers; and continuously balance.  Grip strength, and fine and manual dexterity would be in the normal range for both hands.[44]  The physical impairments would have an impact on the person's mental residual functional capacity causing mild limitations in the

---

[40]Tr. 43.

[41]Tr. 44-45.

[42]Tr. 45.

[43]Tr. 47-48.

[44]Tr. 49.

ability for concentration, ability to perform duties within a schedule, ability to sustain a routine without supervision; and moderate limitations in the ability to deal with work production, and the ability to deal with stress. There would be no other mental limitations.[45]

In response to the hypothetical, the VE testified that the person would not be able to perform Garcia's past relevant work, but she would be able to perform the jobs of touch-up screener and semi-conductor bonder, both of which are sedentary, unskilled work.[46]

The ALJ then changed the hypothetical so that the person could lift 15 to 20 pounds occasionally, and could stand 6 hours in an 8-hour day. The VE responded that the person would be able to perform the jobs of hostess and cashier.[47]

The ALJ then gave a third hypothetical in which the person would have flare-ups of rheumatoid arthritis with swelling of the joints and pain which would cause her to miss at least four days of work per month. The VE testified that those limitations would preclude all jobs.[48]

Counsel for Garcia then asked about a person who had the limitations specified in the first hypothetical, but was capable of less than occasional handling and fingering due to rheumatoid arthritis flare-ups, and stiffness and pain. The VE testified that the jobs he had cited would be eliminated, but the person could do the job of surveillance systems monitor which is sedentary, unskilled work. There were approximately 130,000 such jobs in the national economy[49]

---

[45]Tr. 49-50.

[46]Tr. 51.

[47]Tr. 52.

[48]Tr. 52-53.

[49]Tr. 54.

**B. Medical Evidence**

   **1. Allen Sawitzke, M.D.**

On January 12, 2006, Garcia saw Allen Sawitzke, M.D., for an initial evaluation of her rheumatoid arthritis. Dr. Sawitzke noted that Garcia had a 2-3 year history of symmetric knee pain and swelling. Over the last 6-12 months, she had experienced involvement of her hands, feet, knees, elbows, and ankles (most predominantly her hands and wrists had been more sore and swollen). There was no redness associated with the swelling. She had stiffness all day long. Her pain did not vary through the day. She had days when she was worse and was unable to walk or get out of bed in the morning or do her normal activities. When her knee-swelling began two years ago, she self-treated with ibuprofen. She reported that this helped a little, but not very much. Because she had no insurance, she did not seek medical care for a number of years. In September 2005, she went to the Seraphine Clinic for evaluation. She had a positive Rheumatoid factor of 217 and a CRP of 54.1; all other labs were normal. The clinic diagnosed rheumatoid arthritis. They gave her a glucocorticoid IM injection which helped some for about a week. Garcia reported that she had gotten progressively worse and was getting no relief from ibuprofen. She had difficulty sleeping because of the pain; or slept a lot because of severe fatigue. Her largest complaint was the pain in her joints. She complained of severe pain in her left arm, wrist and hand, and her left ankle, although the right side was also bothersome.[50]

Examination of the hands, wrists, elbows, shoulders, neck, back, knees, and ankles was normal except for limited flexion of DIPs and PIPs (finger joints) in both hands; right hand trace synovitis in the 5th PIP and 3rd MCP; trace synovitis of both wrists; joint line tenderness in PIPs

---

[50]Tr. 160.

and DIPs bilaterally; and decreased range of motion in the shoulders. There was no edema in the lower extremities, and her gait was "coordinated and even."[51]

Dr. Sawitzke ordered additional laboratory and x-ray screening. Garcia was to continue on ibuprofen with no other treatment until a diagnosis was made.[52]

An x-ray of the hands taken January 12, 2006 showed "[n]arrowing of the left triquetrum pisiform joint," but the "joint spaces are otherwise maintained" and "[s]oft tissues appear unremarkable" with "[n]o definite erosions."[53] The clinician concluded that the findings indicated "early rheumatoid arthritis."[54]

On April 3, 2006, Garcia reported that she was "doing bad," with pain in her feet and wrists, increased swelling and morning stiffness. She had discontinued prednisone and methotrexate about three weeks earlier because they made her feel irritable and bloated. On examination, Dr. Sawitzke found trace synovitis in her wrists, somewhat limited range of motion in some of her finger joints, but no abnormalities in her elbows, shoulders, knees, and ankles. There was no MTP squeeze tenderness, no pedal edema, and normal gait and station. Dr. Sawitzke's assessment was rheumatoid arthritis. He discontinued her current medications and started her on Plaquenil.[55]

On August 22, 2006, Garcia was a "no show" for her appointment.[56]

---

[51]Tr. 162.

[52]Tr. 162.

[53]Tr. 169.

[54]Tr. 169.

[55]Tr. 165.

[56]Tr. 164.

## 2. Robert M. Silver, M.D.

On April 10, 2007, Robert M. Silver, M.D., saw Garcia in consultation during her pregnancy. In a letter to Alan Christensen, M.D., Garcia's treating physician at a women's clinic, Dr. Silver noted that Garcia had been diagnosed with rheumatoid arthritis about two years earlier, but had experienced symptoms for a couple of years before that. She had seen Dr. Allen Sawitzke for this problem, but had not seen him recently. In the past, she had taken Prednisone and methotrexate. But she had not taken any medications during her pregnancy other than Tylenol. She had chronic pain, and had not had a remission during her pregnancy. She was completely functional, however, and was able to care for her children. She was comfortable not taking medications at that time. Dr. Silver noted that approximately three-fourths of patients undergo clinically significant remission during pregnancy. Although Garcia had not had a remission, she had not "flared" either. Dr. Silver discussed treatment with medication, but Garcia did not wish to take medications during pregnancy, so treatment was deferred at that time. Dr. Silver instructed Garcia to pay close attention to symptoms of rheumatoid arthritis flare postpartum. He noted that flares are common during the postpartum period, and early intervention with medication might reduce the severity of the flare.[57]

## 3. Steven Jay Anderson, M.D.

On May 1, 2008, Dr. Anderson noted that Garcia had a history of rheumatoid arthritis, but no current synovitis. He prescribed Relafen, and ordered laboratory tests and x-rays of the cervical spine and right foot.[58]

---

[57] 166-68.

[58] Tr. 190.

The diagnostic imaging report showed degenerative spondylosis at C5-6 and C6-7. The foot X-ray showed mild hallux valgus (bunion).[59]

On May 21, 2008, Garcia missed her appointment.[60]

On June 5, 2008, Dr. Anderson noted that Relafen had helped some of the swelling, but the pain remained about the same. Garcia wanted to try naproxyn. There was no change in the physical exam. The lab tests showed strong serological evidence of rheumatoid arthritis, but comparatively minimal synovitis. Dr. Anderson noted that the neck x-rays showed some mild to moderate changes, but the foot x-ray was normal except for the bunion. Dr. Anderson placed Garcia on naproxen and a trial of tramadol.[61]

On July 21, 2008, Garcia missed her appointment.[62]

## DISCUSSION

### A. Legal Standard

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[63] The Act further provides that an individual shall be determined to be disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot,

---

[59]Tr. 192.

[60]Tr. 190.

[61]Tr. 190.

[62]Tr. 189.

[63]42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."[64]

A person seeking Social Security benefits bears the burden of proving that because of his disability, he is unable to perform his prior work activity.[65]  Once the claimant establishes that he has such a disability, the burden shifts to the Commissioner to prove that the claimant retains the ability to do other work and that jobs which he can perform exist in the national economy.[66]

The Commissioner's decision must be supported by substantial evidence.[67]  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[68]  Evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.[69]

The Commissioner's findings of fact, if supported by substantial evidence, are conclusive upon judicial review.[70]  In reviewing the Commissioner's decision, the court may not reweigh the evidence or substitute its judgment for that of the agency.[71]  However, the court should carefully

---

[64] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[65] *Miller v. Chater*, 99 F.3d 972, 975 (10th Cir. 1996); *Nielson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).

[66] *Saleem v. Chater*, 86 F.3d 176, 178 (10th Cir. 1996); *Miller*, 99 F.3d at 975.

[67] *Daniels v. Apfel*, 154 F.3d 1129, 1132 (10th Cir. 1998); *Hinkle v. Apfel*, 132 F.3d 1349, 1351 (10th Cir. 1997).

[68] *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[69] *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992); *Emory v. Sullivan*, 936 F.2d 1092, 1093 (10th Cir. 1991).

[70] 42 U.S.C. §§ 405(g), 1383(c)(3); Perales, 402 U.S. at 390.

[71] *Hinkle*, 132 F.3d at 1351; *Decker v. Chater*, 86 F.3d 953, 954 (10th Cir. 1996).

examine the record and review it in its entirety.[72]  Failure of the Commissioner to apply the correct legal standard is grounds for reversal.[73]

The Commissioner has established the following five-step process for determining whether a person is disabled:

(1)     A person who is working is not disabled.  20 C.F.R. § 416.920(b).

(2)     A person who does not have an impairment or combination of impairments severe enough to limit his ability to do basic work activities is not disabled.  20 C.F.R. § 416.920(c).

(3)     A person whose impairment meets or equals one of the impairments listed in the "Listing of Impairments," 20 C.F.R. § 404, subpt. P, app. 1, is conclusively presumed to be disabled.  20 C.F.R. § 416.920(d).

(4)     A person who is able to perform work he has done in the past is not disabled.  20 C.F.R. § 416.920(e).

(5)     A person whose impairment precludes performance of past work is disabled unless the Secretary demonstrates that the person can perform other work available in the national economy.  Factors to be considered are age, education, past work experience, and residual functional capacity.  20 C.F.R. § 416.920(f).[74]

**B.  The ALJ's Decision**

The ALJ performed the sequential analysis, finding as follows:  (1) Garcia has not engaged in substantial gainful activity since September 15, 2005, the alleged onset date; (2) she has severe impairments including rheumatoid arthritis, and "slightly mild depression;" (3) she does not have an impairment or combination of impairments that meets or equals the listings;[75]

---

[72]*Musgrave*, 966 F.2d at 1374; *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

[73]*Daniels*, 154 F.3d at 1132; *Hinkle*, 132 F.3d at 1351.

[74]*Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988).

[75]Tr. 13.

and (4) she is capable of performing her past relevant work as a hostess and a cashier[76]  Although

the ALJ found that Garcia could do her past relevant work, he proceeded to step five where he

found that Garcia is capable of performing other work in the national economy including the jobs

of touch-up screener and semi-conductor bonder.[77]  Based on these findings, the ALJ concluded

that Garcia was not disabled as defined by the Social Security Act.[78]

Garcia raises three arguments in support of her disability claim:  (1) the ALJ erred in his

evaluation of her credibility regarding her pain; (2) the ALJ erred by failing to include of all her

impairments in his residual functional capacity (RFC) evaluation; and (3) the ALJ erred in

finding that she could perform her past relevant work and other work available in the national

economy.[79]

## C. Credibility Determination

Garcia contends that the ALJ failed to properly evaluate her credibility regarding her

pain.[80]  As the Tenth Circuit has observed, the evaluation of a claimant's subjective allegations

of pain and other symptoms "ultimately and necessarily turns on credibility."[81]  Generally,

credibility determinations are the province of the ALJ and should not be disturbed if supported

by substantial evidence.[82]  Nevertheless, the ALJ's findings "should be closely and affirmatively

---

[76]Tr. 18.

[77]Tr. 19.

[78]Tr. 19-20.

[79]Plaintiff's Opening Brief ("Opening Brief") at 2, docket no. 14, filed May 21, 2010.

[80]Opening Brief at 6-10; Reply Brief at 4-5, docket no. 16, filed July 9, 2010.

[81]*White v. Barnhart*, 287 F.3d 903, 909 (10th Cir. 2001).

[82]*McGoffin v. Barnhart*, 288 F.3d 1248, 1254 (10th Cir. 2002); *White*, 287 F.3d at 909.

linked to substantial evidence and not just a conclusion in the guise of findings."[83]  In *Kepler v. Chater*, the Tenth Circuit held that the ALJ must give specific reasons for rejecting a claimant's subjective allegations of pain and other symptoms.[84]  However, so long as the ALJ sets forth the specific evidence he relies on in assessing credibility, the requirements of *Kepler* are satisfied.[85]

In evaluating a claimant's subjective allegations of pain and other symptoms, the ALJ must determine (1) whether the claimant has established by objective medical evidence that she has a pain- or symptom-producing impairment; (2) whether there is a "loose nexus" between the impairment and the claimant's subjective allegations; and (3) if so, whether considering all of the evidence, both objective and subjective, the claimant's alleged symptoms are in fact disabling.[86]

In this case, the ALJ followed the proper analysis, finding that Garcia's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but that her statements "concerning the intensity, persistence and limiting effects" of her symptoms were not entirely credible.[87]  In making his credibility determination, the ALJ thoroughly summarized the medical records and Garcia's testimony about the limitations imposed by her condition. First, the ALJ found that the medical evidence does not support Garcia's contention that she is unable to perform any type of work activity.[88]  Although the ALJ acknowledged that Garcia's rheumatoid arthritis caused pain and stiffness, he stated that the disease appeared to be in the

---

[83]*McGoffin*, 288 F.3d at 1254 (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988)).

[84]68 F.3d 387, 391 (10th Cir. 1995).

[85]*White*, 287 F.3d at 909.

[86]*Hamlin v. Barnhart*, 365 F.3d 1208, 1220 (10th Cir. 2004).

[87]Tr. 18.

[88]Tr. 18.

early stages as evidenced by her medical records. He noted that on examination by Dr. Sawitzke, Garcia demonstrated some pain behavior with ambulation and change of position. But examination of her hands, wrists, elbows, neck, back, knees, and ankles was normal except for limited flexion of the DIPs and PIPs, right hand trace synovitis in the 5th PIP and 3rd MCP, along with joint tenderness bilaterally. Garcia had trace synovitis in both wrists and decreased range of motion in her shoulders. On ambulation, she had a coordinated and even gait with normal deep tendon reflexes of the upper and lower extremities. X-rays of the hands showed some narrowing of the left triquetrum pisiform joint, but the joint spaces were still maintained and the soft tissues appeared unremarkable.[89]

The ALJ found that Dr. Sawitzke conducted a very thorough examination supported by laboratory findings. The ALJ therefore gave weight to the findings and medical opinion of Dr. Sawitzke "which showed that [Garcia] was in only the very early stages of rheumatoid arthritis."[90] According to the ALJ, this meant that she had "not yet experienced any severe joint or bone-on-bone erosion, deformation and or fusion of the joints."[91] The ALJ further noted that although a visit to the rheumatology clinic in April 2006 revealed pain in the feet and wrists, and increased morning stiffness and swelling, she still had a normal gait and station. Further, she had discontinued her meds because they made her feel irritated.[92]

---

[89]Tr.16-17 (citing tr. 160–63, 169).

[90]Tr. 17.

[91]Tr. 17.

[92]Tr. 17, 165.

In April 2007, Dr. Silver noted that although Garcia suffered from chronic pain, she was not taking any medication. Further, she reported that was comfortable not taking any medication at that time. She was fully functional and able to care for her children.[93] The ALJ acknowledged that Garcia was experiencing some pain associated with her condition. But he found that she "had no problems with the actual functioning of her joints as to range of motion." He concluded that she still had the ability to perform light work "while being maintained on pain, anti-inflammatory and other rheumatoid medications."[94]

The ALJ noted that on Garcia's first visit to Dr. Anderson on May 1, 2008, Dr. Anderson's examination revealed no active synovitis. X-rays of the cervical spine showed degenerative spondylosis at C5-6 and C6-7. X-rays of the right foot showed mild hallux valgus (bunion), but was otherwise normal.[95] The ALJ found that the evidence clearly showed that Garcia's rheumatoid arthritis continued to remain in the early stages.[96]

In addition to the lack of support in the medical records that Garcia's condition was so severe as to be disabling, the ALJ also relied on Garcia's testimony that she was able to perform her daily activities and care for her children.[97] Garcia argues that the ALJ mischaracterized her testimony concerning her daily activities. She notes that she testified that her older daughter helped with her younger daughter, and she received help from various relatives with other household chores. In addition, she testified to numerous limitations she experienced on bad

[93]Tr. 17, 166.

[94]Tr. 17.

[95]Tr. 17, 190, 192.

[96]Tr. 18.

[97]Tr. 18.

days.[98]  Garcia correctly argues that  the ALJ may not rely on minimal daily activities as

substantial evidence that a claimant does not suffer disabling symptoms.[99]

"Substantial evidence is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."[100]  It does not require a preponderance.[101] The court concludes

that substantial evidence supports the ALJ's evaluation of Garcia's testimony concerning her

daily activities.  Moreover, his conclusions are supported by the fact that Garcia reported to Dr.

Silver that she was fully functional and able to care for her children.

The court concludes that the ALJ provided adequate reasons for his credibility

determination which is supported by substantial evidence in the record.  Accordingly, the court

declines to disturb his credibility decision.

## D. Residual Functional Capacity Assessment (RFC)

Garcia argues that the ALJ erred by failing to include all of her impairments in his RFC

assessment.  Specifically, she contends that the ALJ failed to include any limitations relating to

her ability to use her hands.[102]  She notes that Dr. Sawitzke found limited flexion of the PIPs and

DIPs of both hands as well as joint tenderness and synovitis in her hands and wrists.[103]  Garcia

also points out that she testified to a number of functional limitations of her hands including the

---

[98]Tr. Opening Brief at 8-9.

[99]*Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993).

[100]*Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009).

[101]*Id.*

[102]Opening Brief at 11.

[103]*Id.* (citing Tr. 162).

inability to put a scrunchie in her hair or use a can opener,[104] difficulty using a pen or a keyboard,[105] and dialing a phone.[106]  She also testified that in the mornings, her hands were stiff and swollen, and she would soak them in hot water or put them in a warm towel to ease the pain.[107]  Garcia states that despite this evidence of hand limitations due to her arthritis, the ALJ found that she could "frequently" use her hands and fingers, and had normal grip strength, and normal fine and gross manual dexterity.[108]  She asserts that it is unclear what evidence the ALJ relied on to make these findings as nothing in the record indicates that she has normal grip strength or dexterity.  She also notes that the ALJ stated that he was giving weight to the opinion of Dr. Sawitzke because he performed "a very thorough examination of the claimant, along with obtaining objective laboratory findings."[109]  She states that although the ALJ acknowledged Dr. Sawitzke's opinion, he then made his own interpretation of Dr. Sawitzke's opinions and findings.[110]  In short, Garcia contends that the evidence supports a conclusion that she suffers pain and a limited range of motion in her hands, but the ALJ nevertheless found that she has unlimited use of her hands and included no such limitations in his RFC assessment.[111]

---

[104]*Id.* (citing Tr. 35).

[105]*Id.* at 11-12 (citing tr. 35-36).

[106]*Id.* at 12 (citing tr. 36).

[107]Id. (citing tr. 41).

[108]*Id.* (citing tr. 15).

[109]*Id.* (citing tr. 17).

[110]*Id.* (citing tr. 17).

[111]Opening Brief at 13.

Contrary to Garcia's argument, however, the ALJ did not find that she has unlimited use of her hands. As the Commissioner points out, the ALJ found that she has the ability to "frequently" use her hands and fingers, as distinguished from "constantly." "Frequently" means "from 1/3 to 2/3 of the time;" while "constantly" means as "2/3 or more of the time."[112] This finding of the ALJ is supported by the report of Dennis Taggart, M.D., who reviewed Garcia's medical records. Dr. Taggart stated that Garcia's arthritis "could prevent constant handling and fingering," so "handling/fingering reduced to frequent."[113]

In determining Garcia's RFC, the ALJ discussed many of the same considerations that led him to conclude that Garcia's testimony was not entirely credible. The Tenth Circuit has noted the relationship between the ALJ's credibility determination and his RFC assessment: "Since the purpose of the credibility evaluation is to help the ALJ assess a claimant's RFC, the ALJ's credibility and RFC determinations are inherently intertwined."[114]

In making his RFC assessment, the ALJ relied on the medical evidence and Garcia's testimony that he found credible. He found that the medical evidence, which he described as "sparse," showed "some remediation of symptoms and fairly good control of the claimant's arthritis."[115] He further noted that there was no indication of a worsening of Garcia's arthritis and that none of her doctors reported that her impairments would preclude light or sedentary

---

[112]*Dictionary of Occupational Titles*, App. C (4th ed. rev. 1991), 1991 WL 688702.

[113]Tr. 180.

[114]*Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009).

[115]Tr. 18.

work.[116]  The ALJ also relied on Garcia's own testimony concerning her ability to perform her daily activities, and to take care of her children.[117]

Garcia essentially argues that the ALJ's RFC determination was incorrect because he did not accept as fully credible the limitations that she described in her testimony.  As discussed, the ALJ adequately supported his credibility determination, and it is supported by substantial evidence.  The ALJ's RFC assessment is likewise supported by substantial evidence.

---

[116]Tr. 18.

[117]Tr. 18.

**E. Determinations at Steps Four and Five**

Garcia states that the ALJ failed to support with substantial evidence his findings that she could return to her past relevant work or perform other work in the national economy.[118] Regarding Garcia's ability to perform her past relevant work, the court agrees with the Commissioner that there is no need to address this question since the ALJ proceeded to step five of the analysis, finding that Garcia could perform other work available in the national economy.[119] Specifically the ALJ found that Garcia could do the jobs of touch-up screener and semi-conductor bonder.[120]

Garcia states that the record is uncontradicted that she has limited range of motion and pain in her fingers and wrists, but that the ALJ failed to include these limitations in his RFC. She notes that the VE testified that she would be unable to perform both of these jobs if her ability to handle and finger was less than occasional.[121] As discussed above, however, the ALJ's RFC assessment did not limit Garcia to less than occasional handling or fingering. Rather, he found that she could "frequently" perform actions using her hands and fingers.[122] Since the ALJ did not accept these limitations, he was not required to include them in his RFC assessment or in his hypothetical to the VE.[123] The court concludes that the ALJ's finding that Garcia can

---

[118]Opening Brief at 14-18; Reply Brief at 7-10.

[119]Defendant's Answer Brief at 17, docket no. 15, filed June 25, 2010.

[120]Tr. 19.

[121]Opening Brief at 16-17; tr. 54. The court notes that "occasionally" means "up to 1/3 of the time." *Dictionary of Occupational Titles*, App. C, 1991 WL 688702.

[122]Tr. 15.

[123]*Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir. 1995).

perform work available in the national economy is supported by substantial evidence in the record.

**ORDER**

The ALJ followed the correct legal standards, and his decision is supported by substantial evidence. Accordingly the ALJ's decision is **AFFIRMED**.

March 28, 2011

BY THE COURT:

David Nuffer
U.S. Magistrate Judge